## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| LARRY JOHNSON EDWARDS, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )    1:14CV224 |
| | ) |
| OLIVER WASHINGTON,[1] | ) |
| | ) |
| Respondent. | ) |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Petitioner, a prisoner of the State of North Carolina, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Docket Entry 2.) On August 26, 2011, a jury in the Superior Court of Orange County found Petitioner guilty of two counts of second degree sex offense, assault inflicting serious injury, false imprisonment, and assault with a deadly weapon in cases 10 CRS 50792 through 50794. (See Docket Entry 7-3 at 45-48 (verdicts); see also Docket Entry 2, ¶¶ 1-2, 4-6.)[2] The trial court then consolidated the convictions into two sets (one for each of the two victims) and sentenced Petitioner in the middle of the presumptive range to two consecutive terms of 86 to 113 months' imprisonment. (See Docket Entry 7-3 at 51-54 (judgment and commitment forms); see

---

[1] The Petition originally named Donald Mobley, then-Administrator of Warren Correctional Institution, as Respondent. (See Docket Entry 2 at 1.) On April 16, 2014, the North Carolina Department of Public Safety, Division of Adult Correction and Juvenile Justice, named Oliver Washington as the Administrator of Warren Correctional Institution. (See http://www.ncdps.gov/newsrelease. cfm?id=1739 (last visited May 27, 2015).) Consistent with Rule 2(a) of the Rules Governing Section 2254 Cases and by operation of Federal Rule of Civil Procedure 25(d) (applicable to this proceeding pursuant to Rule 12 of the Rules Governing Section 2254 Cases), Oliver Washington now appears as Respondent.

[2] Pin citations refer to the page number in the footer appended to said document by the CM/ECF system.

<u>also</u> Docket Entry 7-11 at 1810-13 (sentencing transcript); Docket Entry 2, ¶ 3.) The North Carolina Court of Appeals affirmed Petitioner's convictions. <u>State v. Edwards</u>, No. COA12-117, 221 N.C. App. 434 (table), 727 S.E.2d 26 (table), 2012 WL 2308798 (June 19, 2012) (unpublished). Petitioner did not thereafter file a petition for discretionary review with the North Carolina Supreme Court. (<u>See</u> Docket Entry 2, ¶ 9(e).)

Petitioner subsequently filed a pro se motion for appropriate relief ("MAR") (Docket Entry 7-6; <u>see also</u> Docket Entry 2, ¶¶ 10, 11(a)(1)-(4)), which the trial court summarily denied (Docket Entry 7-7). Thereafter, the North Carolina Court of Appeals rejected Petitioner's certiorari petition. (Docket Entry 7-8 (certiorari petition), Docket Entry 7-10 (order denying certiorari); <u>see</u> Docket Entry 2, ¶ 11(d).)

Petitioner next submitted his instant Petition to this Court. (Docket Entry 2.) Respondent moved for summary judgment (Docket Entries 6, 7) and Petitioner responded in opposition (Docket Entry 9).

## I. Factual Background

The North Carolina Court of Appeals summarized some of the basic facts underlying Petitioner's convictions as follows:

> On the evening of 10 March 2010, [victim SB] visited [Petitioner] at his home with plans to party that night. They had first met the previous night at [Petitioner's] house, and SB had given [Petitioner] oral sex and smoked crack cocaine with him.
>
> When SB arrived at [Petitioner's] house that night, he spoke to her in a hostile manner, and when she attempted to leave, he locked the front door. [Petitioner] then

-2-

lectured SB that he was the boss and she was not to touch the door. [Petitioner] and SB then went to [Petitioner's] bedroom with another man, and the three prepared to smoke crack cocaine. SB's cell phone kept ringing, and [Petitioner] slapped her face and took her phone, prohibiting her from contacting her family. [Petitioner] told the other man to watch the door, then forced SB to provide oral sex repeatedly for the rest of the night, interspersed with breaks to smoke crack cocaine.

SB remained in [Petitioner's] house for roughly forty-eight hours. She was allowed to move about the house, but only upon receiving [Petitioner's] express permission to do so. She was initially allowed to use the bathroom, but was not allowed to shut the door. She was allowed very little food. SB testified at trial that she was forced to comply with [Petitioner's] demands for oral sex, because she felt that she was a captive, had already been slapped once, and feared further physical violence if she refused.

More people came to [Petitioner's] house, and he became increasingly angry and periodically wielded a loaded shotgun in front of SB. At that point, she was no longer allowed to use the bathroom, but instructed to use a jar in the bedroom. [Petitioner] ordered SB to remove her shirt and then her pants, and when she finally did, he struck her in the head with a steel step stool. When she regained consciousness, [Petitioner] stated that he had hit her because she had been too slow in removing her pants. Then, [Petitioner] began swinging a wooden crutch at her and breaking things in the bedroom, after which he ordered SB to clean up the mess. [Petitioner] then began walking around the house with a rifle.

Eventually, SB was able to remove rods from a window in the bedroom and flee into the night wearing nothing but her bra. Neighbors summoned law enforcement, who found bruising around SB's head and neck.

Deputies came to [Petitioner's] house on 16 March 2010 to arrest him and execute a search warrant. They found [Petitioner] in the hall of the residence yelling angrily. Deputies recovered a loaded shotgun and a metal step stool with a red stain on it. Subsequent DNA testing positively identified the stain on the stool to be SB's blood.

On 7 June 2010, [Petitioner] was indicted for first-degree kidnapping, second-degree sexual offense,

-3-

> keeping or maintaining a dwelling house for the use of controlled substances, and assault with a deadly weapon. He was also indicted for an additional count of second-degree sexual offense as well as assault inflicting serious bodily injury relating to a similar incident involving another victim.

Edwards, 2012 WL 2308798, at *1-2.

The North Carolina Court of Appeals did "not include the facts involving the second victim as they [we]re not relevant to [Petitioner's] appeal." Id. at *2 n.1. The second victim, LK, testified that, on March 6, 2010, Petitioner telephoned LK and asked her to come over and "party" with him. (Docket Entry 7-11 at 484.) "Partying" involved LK giving Petitioner oral sex in exchange for his providing crack cocaine for them to smoke. (Id. at 484, 486, 490.) Petitioner paid an individual $15 for driving LK to his residence. (Id. at 486, 490.)

After LK arrived at Petitioner's residence, she entered Petitioner's bedroom where Petitioner instructed LK to take off her clothes and hand him her cell phone. (Id. at 491-92.) As Petitioner and LK smoked crack cocaine, LK sat on a green foot stool and attempted multiple times to perform oral sex on Petitioner, but Petitioner kept stopping her to smoke more crack. (Id. at 484-85, 487.) At some point while Petitioner and LK smoked crack cocaine together, Petitioner loaded a shotgun and placed it beside the bed. (Id. at 488, 624.)

After five or six hours of smoking crack, LK grew tired and expressed to Petitioner her readiness to leave. (Id. at 495.) In response, Petitioner shouted at her, causing LK to scream. (Id. at

-4-

485, 487, 495-96.) Petitioner then left the room and returned with a wooden crutch. (Id. at 485, 487, 496.) Petitioner repeatedly beat LK with the crutch until it broke into pieces. (Id. at 487, 496-97, 499-500, 540.) After the crutch broke, Petitioner grabbed a bar from a towel rack and started poking LK with it. (Id. at 487, 516.)

During the beating, LK moved all over the bedroom floor, attempting to avoid Petitioner's blows. (Id. at 487-88, 496-97, 499.) Petitioner threatened LK that he would not stop beating her until she "quit screaming." (Id. at 500.) He also told her that "[she] will not leave until [she did] the job [she] came here to do" (id.) and that "[she] will wish [she was] dead and [she] will beg [him] to kill [her] by the time [he's] through with [her]" (id. at 502).

Following the beating, Petitioner ordered LK to clean up the pieces of the crutch. (Id. at 468, 497, 528-29, 540, 567-69.) Once LK had finished cleaning up, Petitioner commanded her, "Now do the job you came here to do." (Id. at 488, 501.) After LK performed oral sex on Petitioner, he placed her on his bed and penetrated her vagina. (Id. at 473-74, 502-03.) LK denied that she consented to the vaginal intercourse. (Id. at 502.)

After sexually assaulting LK, Petitioner asked her to smoke more cocaine. (Id. at 488, 503.) LK responded that she just wanted to go home, but Petitioner told her "[she was] not going anywhere" and that they would smoke the cocaine "hit for hit." (Id. at 488, 504.) After smoking another large quantity of crack

-5-

cocaine, Petitioner asked LK, "Am I going to go to jail tonight?" to which she responded, "No, . . . you're not." (Id. at 489, 505.) Petitioner then asked LK what time she needed to go home, and she told him 6:00. (Id. at 488-89, 505.) Petitioner and an acquaintance drove LK to the apartment complex of one of LK's friends because LK did not want Petitioner to know where she lived. (Id. at 505-06.)

After finding the pain intolerable, LK reported to the emergency department of a hospital on March 9, 2010. (Id. at 506, 508-09, 665, 1096.) While LK remained at the hospital, a sheriff's deputy took multiple photographs of LK's injuries. (Id. at 700-13.) The nurse practitioner who treated LK at the hospital testified that LK's injuries harmonized with LK's account of being beaten with a wooden crutch two days earlier. (Id. at 1148, 1151-58, 1162, 1166-67.)

## II. Grounds for Relief

Petitioner raised three grounds for relief in his Petition: (1) his trial counsel provided ineffective assistance (see Docket Entry 2 at 4, 9); (2) the trial court "abus[ed] its discretion repeat[ed]ly" (id. at 4; see also id. at 7-8); and (3) the prosecution engaged in "misconduct" (id. at 5; see also id. at 10-12).

## III. Habeas Standards

The Court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation

-6-

of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Further, "[b]efore [the] [C]ourt may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court. In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to [this] [C]ourt in a habeas petition. The exhaustion doctrine . . . is now codified at 28 U.S.C. § 2254(b)(1)." O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); see also 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, expressly waives the requirement.").

When a petitioner has exhausted state remedies, this Court must apply a highly deferential standard of review in connection with habeas claims "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d). More specifically, the Court may not grant relief unless a state court decision on the merits "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. To qualify as "contrary to" United States Supreme Court precedent, a state court decision either must arrive at "a conclusion opposite to that reached by [the United States Supreme] Court on a question of law" or "confront[] facts that are materially indistinguishable from a relevant [United States] Supreme Court precedent and arrive[] at a

-7-

result opposite" to the United States Supreme Court. <u>Williams v.</u>
<u>Taylor</u>, 529 U.S. 362, 406 (2000). A state court decision "involves
an unreasonable application" of United States Supreme Court case
law "if the state court identifies the correct governing legal rule
from [the United States Supreme] Court's cases but unreasonably
applies it to the facts of the particular state prisoner's case."
<u>Id.</u> at 407; <u>see also</u> <u>id.</u> at 409–11 (explaining that "unreasonable"
does not mean merely "incorrect" or "erroneous").

## IV. Discussion

**Ground One**

In his first ground for relief, Petitioner asserts that his
trial counsel provided ineffective assistance by (a) lacking
knowledge of a laboratory report from the North Carolina State
Bureau of Investigation ("SBI"), which concluded that the DNA from
blood found on a step stool seized from Petitioner's residence
matched the profile of one of the victims, until the state offered
the report as evidence at trial; (b) failing to object to the trial
court's refusal to issue a jury instruction on a lesser included
offense to assault with a deadly weapon; (c) failing to prevent the
jury from observing Petitioner in a "jailhouse jumpsuit" on the
first day of trial; (d) failing to argue for consolidated
sentences; and (e) waiving Petitioner's rights "repeat[ed]ly"
during sentencing. (Docket Entry 2 at 4, 9; <u>see also</u> Docket Entry
9 at 3-7.) Ground One provides no basis for relief.

-8-

Petitioner raised an ineffective assistance claim in his MAR nearly identical to Ground One (see Docket Entry 7-6 at 2, 5, 8, 11), and the trial court denied the claim on the merits as follows:

Based upon a review of the file in its entirety in this case, the [c]ourt makes the following findings of fact:

1. One of the allegations at trial was that [Petitioner] used a stool to assault [SB]. The SBI tested several swab[b]ings from the stool and found a match between blood found on the stool and [SB]. These results were compiled into a SBI lab report.

2. On the third day of testimony/fifth day of trial, defense counsel . . . informed the trial judge that he did not learn of the SBI lab report until that morning. On this basis [defense counsel] sought a mistrial.

3. The State responded that the SBI report was given to the initial defense attorney of record . . . and that notice of the production of the report was placed into the court file.

4. [Defense counsel's] motion was based on the grounds that the late discovery of the SBI lab report was prejudicial to his client, in that the defense relied heavily on the absence of a lab report linking blood located on the stool to the victim.

5. In response to the motion, [the trial judge] requested a voir dire of [initial defense counsel] before [the] trial [resumed].

6. During voir dire [initial defense counsel] testified that he did not remember specifically giving the report to [defense counsel] when he took over the case, but that it was his normal practice to turn over his complete file.

7. During cross-examination, it was revealed that [the prosecutor] and [initial defense counsel] had exchanged emails acknowledging the existence of the SBI report in supplemental discovery.

8. [Defense counsel] stated he may have overlooked the notice of the SBI lab supplemental discovery report in the court file, but had no

–9–

independent knowledge of it until the third day of
testimony/fifth day of trial.

9. [The trial judge] found that [initial defense
counsel] received notice of the SBI lab report and
that this supplemental discovery notice was placed
in the court file therefore it was available to
[Petitioner].

10. [The trial judge] found there was no discovery
violation and denied the motion for a mistrial,
further noting that no alternative grounds for a
mistrial existed under N.C.G.S. Sec. 15A-1061.

11. During the direct examination of SBI analyst
. . ., the SBI report was admitted over objection
by the defense.

Based upon the foregoing findings of fact, the [c]ourt
makes the following conclusions of law:

1. According to Strickland v. Washington, 466
U.S. 668, 687 (1984), to prove ineffective
assistance of counsel the defendant must show that
counsel's performance was deficient. This requires
showing that counsel made errors so serious that
counsel was not functioning as the "counsel"
guaranteed the defendant by the Sixth Amendment.
Second, the defendant must show that the deficient
performance prejudiced the defense. This requires
showing that counsel's errors were so serious as to
deprive the defendant of a fair trial, a trial
whose result is reliable. [Id.]

2. Applying the first prong of the Strickland
test, [defense counsel's] failure to locate or
review the SBI lab report prior to trial might have
prevented him from employing other defense
strategies at trial. Professional norms dictate
that defense counsel will be familiar with all
discovery in every client's case, but it is
understandable, though not excusable, that in the
course of representing many clients in an otherwise
professional and competent manner, counsel may from
time [to time] overlook or fail to locate a piece
of relatively peripheral discovery. When this
happened, counsel appropriately sought a mistrial.

3. Regardless, under the second prong of
Strickland, this [c]ourt cannot conclude that this
error deprived [Petitioner] of a fair trial. The

-10-

SBI lab report was but a small component of the overwhelming inculpatory evidence used at trial, including the testimony of the two victims. This evidence was simply corroboration of testimony given by other witnesses.

4. Even assuming the performance in not locating the lab report within the discovery prior to trial is deficient performance, the [c]ourt is unable to conclude that more timely discovery of the report would have resulted in a difference in the proceedings.

Based on its consideration of the matters noted above, the [c]ourt concludes as a matter of law that Petitioner is not entitled to the relief that he seeks and that his assertions are without merit.

(Docket Entry 7-7 at 2-4).[3]

In light of that adjudication on the merits, Section 2254(d)'s highly deferential standard governs this Court's review of Petitioner's instant parallel claim and the Court thus must consider whether the MAR court contradicted or unreasonably applied clearly established federal law.[4] The Fourth Circuit has provided guidance in regards to the clearly established law governing ineffective assistance claims:

In order to establish an ineffective assistance of counsel claim . . ., [a petitioner must] establish that his "counsel's representation fell below an objective standard of reasonableness," measured by the "prevailing professional norms," [Strickland, 466 U.S. at 688], and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

_____

[3] Beyond his allegations regarding the SBI report, Petitioner raised in his MAR the same additional bases for his ineffective assistance claim as he raised in Ground One; however, the MAR court did not specifically discuss those bases in its order. (See Docket Entry 7-7). Nevertheless, absent circumstances indicating otherwise, even an unexplained, summary order constitutes an adjudication on the merits for purposes of § 2254 deference. See Harrington v. Richter, 586 U.S. 86, 98-100 (2011).

[4] Petitioner does not contend that the MAR court relied on any unreasonably determined facts. (See Docket Entry 2 at 4, 9; Docket Entry 9 at 3-7.)

-11-

proceeding would have been different," id. at 694.
"Unless a [petitioner] makes both showings, it cannot be
said that the conviction or . . . sentence resulted from
a breakdown in the adversary process that renders the
result unreliable." Id. at 687.

In determining whether counsel's performance was
deficient, "[i]t is all too tempting for a [petitioner]
to second guess counsel's assistance after conviction or
adverse sentence, and it is all too easy for a court,
examining counsel's defense after it has proved
unsuccessful, to conclude that a particular act or
omission of counsel was unreasonable." Id. at 689.
Hence, "court[s] must indulge a strong presumption that
counsel's conduct falls within the wide range of
reasonable professional assistance . . . [and] that,
under the circumstances, the challenged action might be
considered sound trial strategy." Id. (internal
quotation marks omitted).

Similarly, in evaluating whether [a petitioner] has shown
actual prejudice from any such deficient performance, it
is insufficient for the [petitioner] "to show that the
errors had some conceivable effect on the outcome of the
proceeding," because "[v]irtually every act or omission
of counsel would meet that test." Id. at 693. Rather,
a "reasonable probability" that the result would have
been different requires "a probability sufficient to
undermine confidence in the outcome." Id. at 694. When
challenging a conviction, "the question is whether there
is a reasonable probability that, absent the errors, the
factfinder would have had a reasonable doubt respecting
guilt." Id. at 695.

Fisher v. Lee, 215 F.3d 438, 446-47 (4th Cir. 2000) (internal

parallel citations omitted).

Moreover, the United States Supreme Court has cautioned that

"[s]urmounting Strickland's high bar is never an easy

task. . . . Even under de novo review, the standard for judging

counsel's representation is a most deferential one." Harrington v.

Richter, 562 U.S. 86, 105 (2011) (internal quotation marks

omitted). Further, "[w]here the issue is whether the state court

has unreasonably applied Strickland standards to a claim of

-12-

ineffective assistance of counsel, . . . double deference is required . . . ." <u>Lavandera–Hernandez v. Terrell</u>, No. 1:12CV553, 2013 WL 1314721, at *4 (M.D.N.C. Mar. 28, 2013) (Schroeder, J.) (unpublished) (internal quotation marks omitted), <u>appeal dismissed</u>, 539 F. App'x 159 (4th Cir. 2013); <u>see also</u> <u>Harrington</u>, 562 U.S. at 105 ("The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." (internal citations and quotation marks omitted)).

Accordingly, when the Court's examination of an ineffective assistance claim proceeds under Section 2254(d), "[t]he question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard." <u>Harrington</u>, 526 U.S. at 105; <u>see also</u> <u>Cullen v. Pinholster</u>, ___ U.S. ___, ___, 131 S. Ct. 1388, 1398 (2011) (observing that Section 2254(d) imposes "a difficult to meet and highly deferential standard . . ., which demands that state-court decisions be given the benefit of the doubt . . . [and that a] petitioner carries the burden of proof" (internal citations and quotation marks omitted)). In other words, "under the dual, overlapping lenses of [Section 2254(d)] and <u>Strickland</u> [the Court must] ask[] the following question: Was the [MAR court]'s holding incorrect to a degree that its conclusion was so lacking in justification that it was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement?" <u>Moore v. Hardee</u>, 723 F.3d 488, 496 (4th Cir. 2013) (internal brackets, ellipses, and quotation marks omitted). Under this standard, the MAR court's denial of this ineffective

-13-

assistance claim did not contradict or unreasonably apply Strickland.

Even assuming, arguendo (as the MAR court did), that Petitioner's trial counsel rendered deficient representation by failing to sufficiently investigate the discovery provided by the state so as to apprise himself of the SBI laboratory report, Petitioner's ineffective assistance claim still lacks merit, because he has failed to demonstrate that the MAR court unreasonably determined that he could not show the requisite prejudice under Strickland.

First, as recognized by the MAR court (see Docket Entry 7-7 at 3), beyond the SBI report, the state introduced very strong evidence of Petitioner's guilt. In particular, the two victims each testified to encounters with Petitioner on different days that shared many similarities, including Petitioner's initiating contact with the victims by a telephone call, his payment of a driver to bring the victims to his residence, his offering of crack cocaine in exchange for oral sex, his command that the victims sit on a footstool to perform the oral sex, his possession of a shotgun, and his use of a wooden crutch to beat (or attempt to beat) the victims. (See Docket Entry 7-11 at 479-571, 585-86, 735-48, 881-972, 1053, 1063.) Moreover, as relates to victim SB, a married couple who lived in a house near to Petitioner's residence each corroborated SB's testimony that she banged on their door in the middle of the night, appeared frantic and terrified, and wore nothing but a bra with dirt and blood covering her body. (See id.

-14-

at 1065-82, 1092-1102.)  Further, a sheriff's deputy who responded to the couple's 911 call testified to observing injuries on SB's head and neck consistent with her account of being hit in the head with a metal step stool.  (See id. at 1108-19.)  As regards victim LK, the nurse practitioner who treated LK's injuries found them consistent with LK's account that Petitioner beat her all over her body with a wooden crutch two days prior.  (See id. at 1148, 1151-58, 1162, 1166-67.)

Due to the strength of that evidence, Petitioner cannot show a reasonable probability of a different trial outcome had his trial counsel known of the SBI report prior to trial.  See United States v. Flute, 363 F.3d 676, 678 (8th Cir. 2004) ("The strength of the properly admitted evidence was great.  Two victims testified directly about how [the defendant] had victimized them, and there was additional physical evidence consistent with the abuse."); Hernandez v. Pliler, No. 03-2368PJH, 2007 WL 2047570, at *12 (N.D. Cal. Sept. 14, 2004) (unpublished) ("[T]he evidence in this case was not 'thin.'  Instead, the prosecution presented a strong case against [the defendant], including physical evidence which corroborated [the victim's] accusation of molestation."), aff'd, No. 04-17131, 2006 WL 377136 (9th Cir. Feb. 17, 2006) (unpublished).

Second, Petitioner's trial counsel first learned of the SBI report on August 19, 2011 (see id. at 762-66), and the state did not call the SBI laboratory analyst and introduce the report as evidence until August 23, 2011 (see id. at 1265-66).  Therefore,

-15-

Petitioner's trial counsel had four days to review the report and adjust his defense of Petitioner's case accordingly. Indeed, on cross-examination of one of the victims, defense counsel elicited facts to support an alternative explanation for the presence of the victim's blood on Petitioner's step stool (the victim's menstrual cycle) (see id. at 999-1007), and elaborated at some length on that explanation during closing argument (see id. at 1732-35). Given Petitioner's trial counsel's ability to develop an alternative explanation for the victim's blood on Petitioner's step stool, Petitioner has not shown that his counsel's failure to discover the SBI report earlier resulted in prejudice. Petitioner's conclusory speculation that his trial counsel's (and his own) earlier knowledge of the SBI report would have raised a "reasonable probability of a different result" (Docket Entry 9 at 5) does not suffice to establish Strickland prejudice. See Cano v. United States, Nos. 1:05CR354-4, 1:09CV321, 2009 WL 3526564, at *3 (M.D.N.C. Oct. 22, 2009) (unpublished) (Dietrich, M.J.) ("Petitioner has provided only conclusory allegations which meet neither the error nor the prejudice prong of the Strickland analysis."), recommendation adopted, slip op. (M.D.N.C. Dec. 29, 2009) (Beaty, C.J.).

Petitioner's attempt to show ineffective assistance based on his trial counsel's failure to object to the trial court's refusal to instruct the jury on a lesser included offense to assault with a deadly weapon fares no better. The transcript of the charge conference makes clear that Petitioner's trial counsel requested

-16-

that the trial court consider instructing the jury on a lesser included offense to assault with a deadly weapon. (<u>See</u> Docket Entry 7-11 at 1671-73.) However, the trial court declined to do so:

> [TRIAL] COURT: I don't think we need to do a lesser included on that. I mean, it's an A1 misdemeanor. I mean, if we get to the point where all we have left are misdemeanors and he has been in custody what, I think 17 months --
>
> [PETITIONER]: Yes, sir.
>
> [TRIAL] COURT: -- I think that's sort of -- I'm not giving a lesser included on assault with a deadly weapon.
>
> [PETITIONER'S TRIAL COUNSEL]: Okay. And I'm not going to object, Your Honor. I just raised it for the Court's consideration.

(<u>Id.</u> at 1673.)

As the trial court recognized, assault with a deadly weapon constitutes a Class A1 misdemeanor under North Carolina law. <u>See</u> N.C. Gen. Stat. § 14-33(c). Under the version of N.C. Gen. Stat. § 15A-1340.23(c) in effect on the date of Petitioner's sentencing, 150 days' imprisonment constituted the maximum sentence length for A1 misdemeanors for criminal defendants, like Petitioner, with five or more prior convictions. As of the time of sentencing, Petitioner already had spent approximately 17 months in custody. (<u>See</u> Docket Entry 7-3 at 51 (indicating that Petitioner received credit against sentence for 529 days in jail).) Thus, the trial court correctly acknowledged that, regardless whether the jury found Petitioner guilty of misdemeanor assault with a deadly weapon or a lesser included misdemeanor assault, no sentence the trial

-17-

court could impose on the misdemeanor verdict would exceed the length of time Petitioner had already served in jail. Accordingly, Petitioner's trial counsel could not have provided ineffective assistance by failing to object under such circumstances. See Oken v. Corcoran, 220 F.3d 259, 269 (4th Cir. 2000) ("[C]ounsel was not constitutionally ineffective in failing to object . . . [when] it would have been futile for counsel to have done so . . . .").

Petitioner's further assertion that his counsel provided deficient performance by failing to prevent the jury from observing Petitioner in a "jailhouse jumpsuit" on the first day of trial similarly fails. "A state cannot compel a defendant to stand trial before a jury wearing identifiable prison clothing without offending that defendant's Fourteenth Amendment due process rights." Whitman v. Bartow, 434 F.3d 968, 970 (7th Cir. 2006) (citing Estelle v. Williams, 425 U.S. 501, 505 (1976)). "However, the Supreme Court in Estelle noted that the defendant must timely object to appearing in prison attire and 'the failure to make an objection to the court as to being tried in such identifiable prison clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation.'" Id. at 970-71 (quoting Estelle, 425 U.S. at 512-13) (internal brackets omitted). As concerns his wearing of prison clothing, Petitioner "does not allege coercion – he claims ineffective assistance of counsel." Givens v. Del Papa, 177 F. App'x 771, 773 (9th Cir. 2006).

-18-

To support Petitioner's assertion that his trial counsel failed to ensure that the jury did not observe Petitioner in prison attire, he merely cited to the following portion of his trial counsel's argument to the trial court regarding sentencing:

> I was very disappointed the first day when we were here, Your Honor, when – when he came to [c]ourt dressed as he was because I thought there were clothes there. As the [c]ourt knows, I went out that night with my wife; and I picked out clothes for him to wear to court. When he walked into that room the next day and sat down in that chair dressed in a new shirt – not new tie because it was a tie that I picked out from my ties – new pants, I thought the man was going to cry like a baby that somebody cared enough to go do that. And, Your Honor, I would have done that had I known it wasn't already taken care of. It didn't take the [c]ourt telling me that that needed to be done. But he almost cried like a baby. Now, that spoke to me in some significant ways.

(Docket Entry 7-11 at 1809-10.)

This passage does not establish the ineffectiveness of Petitioner's trial counsel for two reasons. First, the excerpted statements do not indicate the date on which Petitioner appeared in court in prison clothing (beyond an ambiguous reference to "the first day when we were here") and, thus, does not establish that the jury observed Petitioner in such attire. (See id. at 11-67 (reflecting that, prior to jury selection, trial court heard pretrial motions on first day of trial session).) Second, and more significantly, as discussed above, due to the strength of the evidence of Petitioner's guilt, Petitioner cannot show that the jury observing him in prison attire on one day of trial (if such observation even occurred) resulted in any Strickland prejudice. See Lee v. Cain, 397 F. App'x 102, 103 (5th Cir. 2010) (affirming

-19-

denial of habeas relief where counsel allowed defendant to appear for trial in prison garb in light of evidence of guilt); Carter v. United States, 288 F. App'x 648, 650 (11th Cir. 2008) ("[The petitioner has] fail[ed] to demonstrate that he was prejudiced by counsel's performance. The evidence against [the petitioner] on both counts was so strong that there is not a reasonable probability that a jury would have found him not guilty but for the fact that he appeared at trial in prison attire.").

Petitioner additionally urges that his trial counsel supplied ineffective assistance in two ways at sentencing: (1) trial counsel failed to argue for consolidated sentences; and (2) trial counsel repeatedly waived Petitioner's rights at sentencing. (See Docket Entry 2 at 9.) The transcript of the sentencing proceedings belies Petitioner's assertions. Petitioner's trial counsel did in fact make a reasonable argument to the trial court that Petitioner's circumstances warranted consolidated (or concurrent) sentences:

> He is 61 years old. He will be 62 years old in October. The proposal that the State has suggested to the [c]ourt would be reasonable here is in essence a life sentence for this man at Level Three Class C. And I would ask the [c]ourt to run them concurrent and run the misdemeanors concurrent to one sentence in the presumptive range that the [c]ourt would deem appropriate. There are no aggravating factors that would put this in the aggravated range. I would suggest to the [c]ourt in light of his age and in light of his cocaine addiction that it should be on the low end of the presumptive and it should run concurrent. And I would ask the [c]ourt to do that.

(Docket Entry 7-11 at 1808.) This passage reflects that Petitioner's trial counsel actually and reasonably advocated for

-20-

sentencing leniency of the sort Petitioner says his counsel should have sought.

Furthermore, the sentencing proceedings transcript simply does not support Petitioner's allegation that his trial counsel waived Petitioner's rights during sentencing without Petitioner's consent. After sentencing Petitioner, the trial court asked the state about scheduling a hearing for consideration of the STATIC-99 form, which involves an assessment by the North Carolina Department of Public Safety's Division of Adult Correction and Juvenile Justice of Petitioner's risk to the community upon release from prison, and assists the trial court in deciding whether to order Petitioner to enroll in satellite-based monitoring upon release. (Id. at 1813; see also N.C. Gen. Stat. § 14-208.40B (providing for such assessments and hearings); www.nccourts.org/Forms/Documents/1102.pdf (form on which trial court orders assessment and subsequent hearing (last visited June 3, 2015)).)

The parties then discussed the timing of that hearing and the following colloquoy ensued:

> [TRIAL] COURT: The form says DOC must have a minimum 30 days to perform their assessment but no more than 60.
>
> . . .
>
> [PETITIONER'S TRIAL COUNSEL]: We will waive . . . whatever the time limit is. And let me tell . . . the [c]ourt that I have historically done a number of these in this county . . . .
>
> . . .
>
> We usually pick a date that's convenient for everybody to do it. We waive it. [Petitioner] has indicated he wants me to stay involved as it relates to that. And for that

-21-

reason, Your Honor, I will waive, and we can set it any time th[e] week [of October 24th].

. . .

[W]ith [Petitioners'] permission, he has requested that I remain involved in this decision process. We will waive whatever is necessary, and we will get the reports. And I will – Your Honor, we will deal with either you the week of [October] 24th or with any judge who has jurisdiction to do it. And just for the record we will go ahead and indicate that. I believe that that is sufficient. . . . [W]e have actually done them as late as four to six months. And he is in custody. It's not like he is out. So I don't think it's quite as crucial. And we . . . waive any time problems.

. . .

[PROSECUTOR]: So at the [c]ourt's pleasure, if counsel waives that requirements, then we are in no rush.

[TRIAL] COURT: Okay.

[PETITIONER'S TRIAL COUNSEL]: <u>[Petitioner] has authorized me to waive it</u>, and I will waive it.

(<u>Id.</u> at 1816-18 (emphasis added).) As the above-quoted exchange demonstrates, Petitioner's trial counsel represented to the trial court that Petitioner had expressly authorized trial counsel to waive the timing requirements of the STATIC-99 hearing, and Petitioner neither challenged that representation in the trial court (<u>see id.</u>), nor claimed in his instant Petition that he did not in fact authorize the wavier (<u>see</u> Docket Entry 2 at 9). Even more significantly, Petitioner has not explained how waiver of the mere <u>timing</u> requirements of the STATIC-99 hearing in any way prejudiced the outcome of his case. (<u>See id.; see also</u> Docket Entry 9.)

-22-

In sum, the MAR court did not misapply or contradict Strickland in denying Petitioner's parallel ineffective assistance claims.

**Grounds Two and Three**

In Ground Two, Petitioner contends that the trial court abused its discretion by (a) failing to record several bench conferences during jury selection despite Petitioner's request for complete recordation; (b) taking no action when, during jury selection, a potential juror told the trial court he had spoken with his wife about the case; (c) violating Rule 412(d) of the North Carolina Rules of Evidence by not conducting a voir dire of the victim in camera; (d) failing to instruct the jurors on one occasion before they left the courtroom; (e) indicating to counsel and the jury that the trial should not continue into the next week and thereby rushing the jury; (f) violating N.C. Gen. Stat. §§ 15A-1222 and 1223 by not remaining impartial and assisting the prosecutor with her arguments and jury instructions; and (g) allowing the foreperson to write a note about the case from the jury box instead of the deliberation room. (See Docket Entry 2 at 4, 7-8; see also Docket Entry 9 at 1-3.) Via Ground Three, Petitioner alleges that the prosecutor engaged in misconduct by making misleading statements to the jury during closing argument about one of the victim's injuries and by allowing a state's witness to perjure himself about the location of Petitioner's shotgun. (See Docket Entry 2 at 5, 10-12; see also Docket Entry 9 at 1-3.) Grounds Two and Three fail on their merits.

-23-

As an initial matter, Respondent asserts that a procedural bar applies to Grounds Two and Three, and bases that bar on the possibility that the MAR court denied Petitioner's parallel claims on procedural default grounds. (Docket Entry 7 at 7-8.) However, the MAR court's ambiguous statement that Petitioner's parallel claims "are not proper for this Court to consider within the context of a [MAR]" (see Docket Entry 7-7 at 2) does not suffice to establish that the MAR court's ruling rested on grounds of procedural default. See Harris v. Reed, 489 U.S. 255, 263 (1989) (holding that "procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case "'clearly and expressly'" states that its judgment rests on a state procedural bar" (quoting Caldwell v. Mississippi, 472 U.S. 320, 327 (1985), and Michigan v. Long, 463 U.S. 1032, 1041 (1983))).[5]

Turning to the merits, Grounds Two and Three warrant no habeas relief because Petitioner cannot show that the alleged trial errors had "substantial and injurious effect or influence in determining the jury's verdict," Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). As

---

[5] A different procedural bar potentially applies to Grounds Two and Three, because Petitioner did not object at trial to any of his alleged bases of judicial abuse of discretion and prosecutorial misconduct. (See Docket Entry 7-11.) Where a state-court criminal defendant (like Petitioner) fails to make a proper, contemporaneous objection at trial and thus can secure at most plain error review on direct appeal, this Court is "procedurally barred from considering th[at] claim, unless [that defendant] can show cause and prejudice for his failure to preserve the issue by a timely objection." Daniels v. Lee, 316 F.3d 477, 487 (4th Cir. 2003). However, because Respondent did not proffer that procedural bar in support of his instant summary judgment motion (see Docket Entry 7 at 6-12), Petitioner did not have notice and an opportunity to argue that cause and prejudice existed to excuse that default.

-24-

regards Petitioner's allegations against the trial court, Petitioner does not explain how a juror's discussion with his wife during the jury selection process limited to whether he knew the district attorney of Orange County (see Docket Entry 7-11 at 401-02), or minor procedural errors by the trial court (such as permitting the foreperson to write a note (which inquired about lunch arrangements) from the jury box as opposed to the deliberation room (see id. at 1771-72), not instructing the jury on one occasion before they left the courtroom (see id. at 778), failing to record several bench conferences during jury selection (see id. at 289-90), and holding the voir dire of a victim under North Carolina Rule of Evidence 412(d) outside the jury's presence but not in camera (see id. at 604)) had any impact on the jury's verdict. Similarly, Petitioner made no attempt to show how the trial court's alleged "rushing" of the jury (see id. at 1124, 1578, 1582, 1586) or "helping" the prosecutor with arguments and jury instructions (see id. at 1448, 1450, 1452, 1619, 1631, 1647-50, 1685, 1690-91, 1774-85) caused the jury to reach an improper result under the facts of the case; nor could he make such a showing given the strong evidence (described above) against him. See Gilbert v. Moore, 134 F.3d 642, 648 (4th Cir. 1998) (holding that erroneous jury instruction had no "substantial or injurious effect" on jury's verdicts under Brecht given strength of evidence of guilt).

Moreover, Petitioner provides no explanation for how the prosecutor's allegedly misleading comments about the scope of a victim's injuries during closing argument (compare Docket Entry 7-

-25-

11 at 1708 (reflecting prosecutor's argument that Petitioner beat victim LK on "every, single part of her body with maybe the . . . exception of her head and her neck"), with id. at 1723 (containing prosecutor's statement that "CT scans were taken of [LK's] head because there were concerns") had any effect on the jury's verdict, particularly given the testimony of the victim herself and two nurses regarding those injuries (see id. at 478-681, 1144-94, 1197-1219), photographic evidence of her injuries (see id. at 511-13, 701, 710-12, 717), and the trial court's instructions to the jury that the closing arguments of counsel did not constitute evidence and that, if the jury's recollection of the evidence differed from counsel's, the jury's recollection controlled (see id. at 1704-05). See Darden v. Wainwright, 477 U.S. 168, 181 (1986) (describing "relevant question" in prosecutorial misconduct claim as whether prosecutor's acts "so infected the trial with unfairness as to make the resulting conviction a denial of due process" and rejecting such claim even where prosecutor made inflammatory and improper remarks in closing argument) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)); Esser v. Johnson, No. 7:04CV00645, 2005 WL 1677899, at *8 (W.D. Va. Jul. 19, 2005) (unpublished) (rejecting prosecutorial misconduct claim under Brecht).

Finally, with respect to Petitioner's claim that the prosecutor knowingly permitted an officer to commit perjury, Petitioner has not shown that the officer knowingly gave false testimony about the location of Petitioner's shotgun inside the residence, particularly given the officer's testimony that he

-26-

observed the shotgun during the stress of arresting Petitioner, who resisted arrest to such a degree the deputy administered a TASER (see Docket Entry 7-11 at 1568-71). See United States v. Mount, 896 F.2d 612, 624 (1st Cir. 1990) (holding that the petitioner did not establish inaccurate testimony of agent amounted to perjury, where the petitioner failed to show that agent "did not believe what he said to be true"); United States v. Williamson, No. 1:06CR474, 2012 WL 1657929, at *3 (M.D.N.C. May 11, 2012) (unpublished) (recognizing that "an inconsistency can result from innocent mistake or failed recollection rather than falsity"). Nor, given the strength of the evidence against Petitioner (described above), could Petitioner satisfy the materiality requirement for any perjury claim related to the officer's testimony about the shotgun. See United States v. Agurs, 427 U.S. 97, 103 (1976) (holding that perjury claim requires showing of "reasonable likelihood that the false testimony could have affected the judgment of the jury"); Kaluzza v. Thaler, Civil Action No. 6-09-242, 2011 WL 124650, at *7 (S.D. Tex. Jan. 14, 2011) (unpublished) ("[M]ateriality must be judged in light of the strength of the prosecution's case and is difficult to establish where the evidence of guilt is compelling.").

In sum, Grounds Two and Three fail as a matter of law.

### V. Conclusion

Petitioner has not shown a valid basis for habeas relief.

**IT IS THEREFORE RECOMMENDED** that Respondent's Motion for Summary Judgment (Docket Entry 6) be **GRANTED**, that the Petition

(Docket Entry 2) be **DENIED,** and that Judgment be entered dismissing this action without issuance of a certificate of appealability.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

July 2, 2015